Good morning your honors. My name is Frank L. McNamara Jr. I represent plaintiff appellant Bonnie Manchester. I'm joined at council table by my co-counsel Ryan McClain. I shall address the first amendment issues taking eight minutes to do so. Mr. McClain will address the remainder taking four and I've reserved a three-minute rebuttal. You may proceed at council. We're familiar with the briefs so if you want to go straight to the arguments you have more time. I shall your honor. There are three briefs before you. I won't waste your time by regurgitating what is in writing. I'll hit what I think are important salient features of this first amendment case. For centuries, for millennia, teachers have been talking to parents about matters that affect the health and well-being of children, particularly young children and especially children at risk. The issue in this case involves a teacher with a 23-year exemplary record in the Ludlow public school system who has passed with flying colors all of her evaluations as set forth in the complaint. In December of 2020, an 11-year-old student of hers, 11 years old, came to her because she was troubled about identity issues. It was in the midst of COVID where many teens and sub-teens were experiencing very difficult times. The 11-year-old at the heart of this case came herself to Mrs. Manchester. Why? Because Bonnie Manchester throughout her career at the Baird school had exemplified compassionate teachers. She had a particular charism for dealing with at-risk students, of which there were many during COVID. In that December 15, 2020 conversation, they discussed the 11-year-old child's issues with her gender dysphoria and her thought that she might be having to transition to a male. She asked my client, Mrs. Manchester, if she would address those issues with her parents because she was embarrassed to do so. Mrs. Manchester didn't undertake herself to approach the parents. She did so at the request of the 11-year-old child who loved and trusted her. Let me ask you a question about your freestanding First Amendment claim, which I'll distinguish from your Pickering claim. Do you something other than regulations such as retaliatory action? What I'm trying to figure out is whether or not this fits in a traditional content viewpoint discrimination context where you have available to you the more specific Pickering analysis. As your Honor knows from the briefs, that issue was never reached in the lower court. The lower court having decided that the gender dysphoria in this case was not treated by a governmentally imposed restriction. I think we may have mentioned some cases, but that argument was interrupted at the outset. What's your best case that you can maintain such a claim as opposed to a Pickering claim? Content or viewpoint discrimination. Intercepting now your premise that the regulations didn't authorize that. I would say, I think there's a McRae case. I think there may have been. McRae was a, that was a Pickering case, I believe. Okay. Standing here right now, I can't come up with a case, Your Honor, because the issue wasn't reached below. It was cut off at the pass by the judge's, I think, incorrect determination that there was no governmentally imposed restriction. And if you remember from the briefs, we cited numerous examples in the complaint and particularly in exhibit D to the complaint, the termination letter of May 19th, 2021, where not only statutes, but the DESE guidance, which is at the heart of this case was expressly pointed out by the governmental authority as the grounds for dismissal. So it takes, as I said, it takes a grim self-transcendence to conclude that there was no governmentally imposed restriction at work in Mrs. Manchester's punishment for her speech. Let me take you next to a related question, and that is as to municipal liability here. What is the municipal policy, written or unwritten, that you can point to? And the reason I'm asking you this question is in paragraphs 140, and then I believe it's also paragraph 194, you seem to suggest that the superintendent and the like were kind of going it on their own and that there wasn't really a written or articulated school protocol. So how do you reconcile those two things? That's an excellent question. And we thought about this, Your Honor. And the answer is subjectively, the superintendent and the principal thought that the DESE guidance, which flowed from the underlying enabling statute referenced in a footnote in the complaint, they thought that that DESE guidance included the child in this case, when in fact the DESE guidance is very clear. It's vague, but it's clear that the parental rights yield only when the child is 14 or in the ninth grade. Right. And, you know, pause it for a moment. So if we agreed with you on that point, that seems to undermine the existence of a written or unspoken school policy. If they are contravening the guidelines. That's an interesting question. And that's where we get into the analytical distinction between subjective and objective. Well, are you saying there's a Monell claim or not? Are you saying there's a Monell claim or not? Well, Mr. McClain has been studying the Monell claim, and he's, I'm sure he's going to speak to that. So he's asked that question. But on that point, there is, we have the school, we believe at this stage of the development of the record, we believe the school incorrectly interpreted and applied the DESE guidance. We are, however, mindful that it was precisely that governmentally imposed restriction that was cited numerous times by the governmental entity in punishing Mrs. Manchester. So at this stage of the record, we think that's a nice question to be resolved through discovery. Right. Because this is a 12B6. Pardon? Because this is a 12B6. It is a 12B6. Let me ask you, counsel, qualified immunity was not raised in the proceedings below, right? I believe, I believe it was. But was it in the ruling or it wasn't in the ruling? The court just dismissed based on 12B6. Yes, it did. We never reached many, many of the issues that would be nice to address because of what we thought was a premature dismissal. Let me ask you, is there any authority, and I'm going to ask the same question to the defendants, any authority that parents of an 11-year-old child, they're not entitled to know what's going with her gender-wise. I don't think there's any authority, correct? We have the Child's case. We have the Mahmood case. We have the Mirabelli case. And it's very clear that the Supreme Court is looking very, very askance at what I call covert and uncontested facilitation of a child's gender transition. Those three cases involved, I believe two of the three involve this issue. And the court is of the belief that these are essential to parental rights and the health and mental well-being of a child. So based on those Supreme Court cases, this case should, at least for 12B6, should not have been dismissed. Do you agree? I totally agree. And one of the things I'm going to ask this court to do, I think the alleged facts in this detailed complaint more than meet the 12B6 pleading requirements. And I think that Mrs. Manchester, her constitutional violation should be explored further beyond the 12B6 point. The court ruled alternatively that she had lied during the investigation and that that was a separate grounds for termination. Yes, they did. And I'm so glad you raised that, Judge Thompson. I'm very glad you did. If you look at exhibits A, B, C, and D, you will see a progression of school responses. The first letter Mrs. Manchester received, exhibit B to the complaint, doesn't mention any disruption. It only uses the vague phrase, conduct unbecoming a teacher, whatever that means. A month goes by, enter the lawyers, and there's a second letter written to Mrs. Manchester by the school dated, interestingly enough, five years ago this very day, April 6, 2020, 21. And that letter vaguely refers to certain incidents. I'll get the right regard. She, quote, engaged in inappropriate communications regarding an individual's gender identity. Not enough, not enough. So they continued the investigation, Judge Thompson. They had a second interview with my client in which she voluntarily appeared without notes and without records, answered as best she could the questions that were posed to her by counsel for the school. And I have firsthand experience that the terminology used in that questioning during that second interview was vague, convoluted, confusing, and perhaps intentionally so. So are you saying that that should go into the category of a disputed fact? Yes, but it's alleged in the complaint. If you look... Right, because this is a 12B6. And so to know what happened in the investigation, whether or not she lied or not, you have to get to discovery, right? I agree, Your Honor. But if you look at paragraphs 159 through 161 of the complaint, you will see allegations that describe that lying ground that was... It was synthetically generated by defendants two months after the speech at issue in this case. And they did so because they knew that, quote, conduct unbecoming a teacher was legally hollow and would not be a constitutional or any other basis to terminate her employment. So they conjured up additional grounds using, I think, as we allege in the complaint, deceitful techniques and stratagems during the second interview, seizing upon the confused record and the confused terminology of the interrogator to come up with what they set forth was untruthfulness. And it's addressed in paragraph 159 and 161 in the complaint. Okay. Counsel, you're going to have three minutes for rebuttal. Let's hear from your co-counsel. Thank you. Please do introduce yourself on the record to begin. Ryan McLean, plaintiff for the... Excuse me, attorney for the plaintiff appellate. I believe you can start by answering Judge Thompson's question. Yes, Judge Thompson. We are alleging there is a Monell claim. There is a policy in enforce. It was an unwritten policy essentially because they were not following the written policy from DESE. They refer to the written policy from DESE, but they themselves are enforcing essentially would be an unwritten policy because it differs from DESE's guidance. Although they're relying on DESE's guidance, they're doing so incorrectly. I do want to, I think, draw also on the Fletcher case that we had mentioned in our brief with respect to not just the final policy rule, but even the customs and, excuse me, government customs and failure to train. I mean, aside from what happened to Mrs. Manchester, are there any other indicators or any other allegations in the complaint that there was enforcement of this unwritten policy? The so-called unwritten policy? Are you referring to the specific policy that they refer to in terminating mismatches? I'm talking about the unwritten policy that you're talking about during oral argument. No, Your Honor. You're saying there was one, so I'm saying is there any evidence that a policy means it's a policy that's applicable across the board? So I'm saying is there evidence of any manifestations other than what happened to Mrs. Manchester? Did you make any allegations in the complaint that this unwritten policy was otherwise enforced elsewhere? I don't know exactly if we made an allegation in the complaint that was enforced on anyone else. I do know that we made allegations of the complaint that this was an official policy. That underscores sort of the section that we included in our brief about the need for discovery. Mrs. Manchester doesn't have access to all of the perhaps emails or other evidence that you may be referring to at the pleading stage, which we would be entitled to through the course of discovery. But again, even if she doesn't, your position is the complaint is sufficient as is for purpose of 1286. Yes, Your Honor. I mean, but it has to be a plausible allegation based upon a factual, some type of factual assertions that there's the existence of an unwritten policy. That's what I'm trying to figure out. What are the factual allegations, not just what are the broad allegations that don't sound in any factual determination? You know, Judge, standing here, I know that we mentioned several in the brief and cited some paragraphs. I don't recall them right here. They just seem contrary to the allegations which talk about these folks going rogue. Well, I think with respect to... I mean, it can't be both. They can't be going rogue and at the same time following a policy, unless you're saying they're going rogue as to the official policy, but they're acting consistently with an unofficial policy. Correct. I want to... I have very little time. I won't be saying that in the complaint though, but...  I want to address last, the equal protection portion. The district judge dismissed, basically claiming that it was a restatement of the First Amendment. Again, in our briefs, I'll be brief here. One, it's a distinct legal theory. There were several other allegations throughout the complaint. I know those were, you can see those in paragraph 76 through, I believe, 106. Other similarly situated comparators were provided. These were other teachers who signed on, for instance, for a letter with Ms. Manchester, which had expressed concerns over some of the library books. This started, then Ms. Manchester went to... We've obviously... We've dismissed at various instances of a equal protection claim that's reviewed as duplicative of a First Amendment claim. We've got that case law out there. How do we reconcile that case law and the practical consideration of an equal protection claim might have slightly different elements of proof than you'd have to engage in a Pickering analysis? We've got, in my view, a tug and pull on this issue. I believe that case that we said was Monello. We have the First Amendment and retaliation claims that we had made. Then we have a separate theory about how she was treated differently based on not only the exercise of the First Amendment, but even essentially the viewpoints that she was expressing and the associations that she was making throughout her dealings with the various individual defendants that we've named. Thank you, counsel. Let's hear now from the town. Good morning. May it please the court. I'm David Lawless for the defendants' appellees. I'm going to just take the court's questions in order. There's a lot of them. Excuse me? There's a lot of questions. I hope I got them all, but I'm sure you'll remind me if I didn't. In terms of the issue of analyzing this case as a viewpoint discrimination claim, as opposed to under the Pickering or Garcetti framework, the Supreme Court's made it very clear that the considerations that govern analysis of public employees' speech are different than the considerations that govern analysis of a government rule or regulation that limits speech by the general citizen. Don't we have here something additional? Because again, we have an 11-year-old at the time. And let's assume Manchester gets dismissed for speaking with the parents. But don't the parents have a right to know what's happening to the daughter whose gender or maybe gender transitioning or what's going to happen? Well, I think, Your Honor, at this point, merely- At least for 12B6 purposes. And I also represent the appellees in the foot matter. So I will just note that Mirabelli speaks for itself on that issue. But Mirabelli only addresses the parental claims. There are claims by the teachers in Mirabelli, but the Supreme Court's decision, recent decision, doesn't address them. But let's look at the DESC guidance itself, right? I mean, set that case law aside. So you've got page 27 of the, I believe it's the addendum, where it says that the responsibility for determining a student's gender identity rests with the student or in the case of a young student's not yet able to advocate for themselves with a parent. You've got the same thing on page 28. The best course is to engage a student. And in the case of a younger student, the parent, you've got on page 29, a student who is 14 years of age or older, talk to that person. Student under 14 and is not yet in the ninth grade, the student's parent alone has the authority to decide on disclosure. So it seems to me that there's substantial tension between the school's actions and what the school's policies are. Your Honor, I think the court, again, has to look back to its decision, 2025 decision in the foot matter, which is essentially a companion case, where the court interpreted the DESC guidance and held in the foot matter that the guidance was consistent with the conclusion that a child who does, in fact, advocate for themselves is by definition old enough to advocate for themselves. The guidance also- But here you have an assertion by the school that that's the DESC, is the grounds for terminating the teacher. That the school, well, the individual employees relied on the DESC guidance for the instruction that the parents were not to be told until the child did, right? That's the instruction that went out to teachers. Don't tell the parents until the child has an opportunity to do so themselves. The teacher here was terminated, A, for disregarding that instruction. So it's purely a disciplinary matter vis-a-vis the teacher. Again, Mirabelli- But this is a 12B6, right? So what you're now getting to is weighing factors. And so you're weighing the school's interests against the teacher's assertions as to her rights to speak on an issue of public importance. And all inferences are supposed to be taken in favor of the plaintiff. So how did the district court weigh these factors and reach an inference contrary to that most favorable to the plaintiff? Well, Your Honor, I mean, the district court looked at the actual speech here. So its defendant's position, and the district court concurred, that the speech that dealt with the child, the specific child, was not on a matter of public concern. The complaint does identify basically three topics of conversation. One is the student's brother. One is sort of a general conversation that's, you know, broadly described, but clearly on matters of public concern. And then there's a third conversation about, you know, the childhood issue in this case and that child's gender identity. And it's our position that one child's gender identity is not a matter of public concern. But again, you're construing the complaint in the least favorable view to the plaintiff. The plaintiff alleged that they engaged in a broader, ranging series of discussions that touched on the email, but the email itself related to broader issues going on within the Baird School District. And so how are we to read it so narrowly that it had to have related to some narrow aspect of the conversation that was more broadly described? Well, Your Honor, you know, the case law is clear that a conversation or any speech can include matters that are protected by the First Amendment and matters that aren't. And that's what we have here. So yeah, the general discussion about the school's policies. So under that theory, the general norm is because it's not protected. It's not a matter of public concern. It wouldn't be protected. So that means parents of, you know, young children, you know, here 11 years old are not entitled then to know that the school is helping them undergo a gender transition. Again, some parents might be in favor of helping the child. Others might not. That's not the issue here. But as a parent of an 11-year-old, you know, regardless how mature the child is, it's still 11 years old. So I think that highlights the fact that we have essentially two cases that have grown out of this scenario. One, the Foote case, which involves the parental rights and is an issue that's very much in front of the Supreme Court right now. But if the parents do have a right, then doesn't a teacher have, you know, the school's not telling them, the parents. So there's this teacher who goes up and informs the parents. And if the parents have a right, you know, there's a right the teacher is guided by, you know, or supporting that right the parents have. And she's been sanctioned for that. You noted, Your Honor, that qualified immunity was raised. Okay, but it's not before us at this time. So that might be an issue for another day, which, assuming we were to reverse. I would just point out that the state of the law at the time that these actions took place was not Mirabelli. It was Foote. It was this court's decision. But for purposes of 1286, we have to, right now, we have to look at what the law is right now. For qualified immunity, you might, you know, then that's a separate analysis for another time. Because it's not before us at this time. Okay, Your Honor. I'll move on to the Monell piece. And I think the court is well aware. I mean, the allegation here in the complaint viewed in the light most favorable to the plaintiff is that the school administrators were acting on an ad hoc basis. That they were attempting to implement the DESE guidance. And according to plaintiffs, did so inaccurately. But the DESE guidance isn't a customer policy of the school. There are no facts alleged in the complaint that would support the existence of an unwritten custom. You know, this unwritten rule was never applied to any other teacher or in any other scenario as alleged in the amended complaint. What, in your view, would be enough on that point? I mean, plaintiffs come in, obviously, in a difficult position to be able to allege facts that they don't really have much insight into and are not privy to. So where does, you know, what's enough to get discovery on something like that? I mean, custom cases are always difficult. I mean, clearly here we don't have a formal policy. And custom cases are difficult. But in order, you do have to actually plead factually the existence of a custom. And the way that's generally done is through effectively building a record through public records requests. So it normally comes up in the police context where, you know, some police department X will have a custom of Y. And you're able to demonstrate that through criminal dockets, through, you know, police narratives. What do you do here in a school context? Well, you could do the same thing in the school context. Were there FOIA requests made? I don't believe there were, Your Honor. I'd have to double check, but I don't think so. But if this case proceeds then through discovery, that would be an alternative. They would be able to obtain that information. Yes, I mean, we could. But the reality is there are no facts pledged to support the existence of a custom. I mean, the plaintiff alleges that she wasn't aware of the custom that until supposedly, you know, until the events in this case unfold. Oh, but a plaintiff doesn't have to be aware of customer policy if it's in place, you know. Yes, Your Honor. But I mean, there has to be some plausible allegation, some indication that this custom exists. So what do you make of the fact that apparently there were discussions with the superintendent, with the principal, guidance counselor. There were all these discussions. There was the investigation in the background that went on, which we don't really have much about in the record yet. But they all apparently conferred together and agreed on this termination. Did they do that, all of them? Without some knowledge of what the municipal policy was on that point? I mean, the municipal policy, in effect, was to follow the law as outlined in the desi guidance. But the desi guidance wasn't a municipal customer policy any more than any other, well, any more than a statute of regulation would be. I mean, attempting to follow the law does not establish a municipal customer policy. But this is different because they didn't follow the face of the desi guidance. Well, I mean, this court found in foot that they did. So I, you know, I think it's pretty hard to escape that. This court found that the school in this instance appropriately followed the desi guidance. And I don't think you can, I don't think the plaintiffs can escape that through artful pleading. Counselor, going back to the Pickering analysis, you acknowledged that some, you acknowledged that some of the speech would be classified as discussing issues of public concern. But you seem to be distinguishing the specific speech about the specific young person. And you're saying that that can't be classified as public. But it seems like that's intertwined with the public, the speech involving public concern. How do you disentangle that? Well, I mean, they're clearly related topics. They're related, yes. Yeah, they're related topics. But one, and whether or not one agrees with the school district policy around transgender youth is a matter of public concern. And that was, as alleged, part of what was discussed. But one child's gender identity is no more a matter of public concern than whether or not the child got an A or a D in history class last semester. That's because the child's identity should be kept confidential, correct? Well, yeah, I mean, I would say, Your Honor, not from the parents. But here, can't you see it like the teacher is denouncing the situation? She's informing the parent, who is the right person to announce. She's not going to the media. She's not going to a TV station. She's not talking to the press. But she's raising an issue of public concern. But to the only people she can actually, she can only go to the school, which she's done, or to the parents. Right, well, and going to the parents. I mean, I think we've assumed for purposes of argument that she was speaking as a citizen. But the fact that she's, as a teacher, gone directly to the parents to inform them about their child makes that subject to question. Was she speaking as a citizen as opposed to as a teacher, as a public employee when she had this conversation? And if the parents had a right to know and she was acting pursuant to that right, she was clearly acting as a teacher. So I'm trying to, you know, I'm not trying to introduce something totally new that hasn't been briefed, but there does become a certain circularity problem. So if she's acting as a teacher, then it's okay to fire her because she went to the parents and did the right thing? Yes, Your Honor. It is okay to fire her if she's acting as a teacher. It may be distasteful, but it doesn't violate the Constitution. And similarly here, you know, she wasn't terminated for having a general conversation with the father. About, you know, topics of broad public interest. She was terminated for, A, talking to the father about the child's gender identity, having been instructed not to. Well, was there an instruction not to? I mean, what the complaint laid out to us, and again, it's a 12 v. 6. There had been extensive conversations between the teacher and the student. There had been pre-existing conversations between the teacher and the parent. So as her actions were on the background of prior permission given, and as I read the email, there's no real confidentiality request in that. So again, you seem to be taking all of these as you would argue the case after discovery has occurred. Well, I mean, it is alleged in the complaint that the child had requested that their parents not be told until they had an opportunity to do so. So I don't think it's reading the complaint. That's not exactly what the email says. I mean, that's a very broad reading of the email. So again, I'm just not sure. And again, you have to take that email on the background of pre-existing communications that had been previously established. But here, the plaintiff is a public employee who's received an instruction not to do something and disregarded that instruction. And so, if I may just finish my sentence. And so you have to look at it in that context, that this is a disciplinary matter involving- What if that instruction's unlawful? Well, then- Can she be fired for that then? Or then the next step would be, even if she can't be fired, is this a constitutional violation? Then you would have that underlying question. I come back to your honor to, it may be unlawful vis-a-vis the parents. It may or may not be a violation of the parents' rights, but it's not a violation of the plaintiff's First Amendment rights. To make that instruction. Okay. Thank you, Counselor. Thank you. Let's hear a rebuttal. Please reintroduce yourself on the record. You have a three-minute rebuttal. I have- When this court considered Foote, it addressed the issue of- what has been brought up this morning about the vitality of the DESE guidance. And I'm going to quote from Foote, 128, then 4336. In other words, and I quote, Ludlow's protocol, and that was the terminology used in the Foote case, not policy of the protocol. Ludlow's protocol is one of non-disclosure, instructing teachers not to inform parents about their child's expressions of gender without that student's consent. And I continue to quote, and as relevant here, Superintendent Gazda asserted that the district's actions with respect to the student complied with the DESE guidance and laws and regulations of Massachusetts. And later in that opinion, again, 128, then 4336. And I quote, in addition, the parents are challenging a school policy which after our careful scrutiny, we conclude is legislative, not executive conduct. So that issue was addressed four square with the court concluding that this was a governmentally imposed restriction. Superintendent Gazda certainly believed that it did. And so did, excuse me, so did Principal Manette. A couple of things in closing. We allege in the complaint, my client was unaware of any policy that restricted her. I would ask this court to consider whether she had communicated to the father in this self-independence, off school, off school grounds, off the clock conversation. If she had communicated that his daughter were pregnant, or that she had STDs, or that she was drug addicted, or that she was abusing alcohol or any other sensitive matter, she would not have faced what she is facing now. And what is she facing now? She is facing a imposition of an unconstitutional policy that involves covert and unconsented to facilitation of a child as young as 11's gender transition. That's what she's facing. And that policy has been regarded by the district court to be sufficient to take away vital First Amendment rights of a teacher who, as Judge Dunlop noted, has arguably prior permission to make those communications because Mrs. Manchester, the plaintiff, had been communicating about the 11-year-old's dysphoria and gender transitioning with the mother since December. So this was a continuum that we're looking at in that one conversation. It's the final act in a continuum that was two months old and considered the same subjects. Finally, we, I believe, convincingly pledged that this was a matter of public concern in paragraph 143 of the complaint. It was a public concern because, as I argued in the brief, there are few issues in America today that have not attracted more public scrutiny and interest than this concept of transgendering teens and subteens. And further, the other part of that policy is the decision of school districts to covertly not just keep that information from the parents, but to set in motion an affirmative program to use certain pronouns in the school and to deceive the parents by using birth pronouns in communications at home. This is a public issue and even the lower district court, with all due respect, was not hospitable to our position. Even the lower court agreed that this touched upon a matter of public concern. Thank you, counsel. Thank you. Thank you, counsel. That concludes argument in this case.